1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID JACINTO SALINAS,

          Petitioner,

    v.

KELLY HARRINGTON, Acting Warden,

          Respondent.

_____/

No. C 10-2084 SI (pr)

**ORDER DENYING HABEAS
PETITION AND DENYING
CERTIFICATE OF APPEALABILITY**

**INTRODUCTION**

    David Jacinto Salinas, a prisoner of the State of California, filed this habeas action under 28 U.S.C. § 2254 to challenge his 2007 conviction in the Santa Clara County Superior Court. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition is denied.

**BACKGROUND**

I.    The Crimes

    On February 10, 2006, Salinas and his co-defendant Manuel Louis Madril were charged by information with one count of the murder of Myra Aguirre (California Penal Code § 187;[1] count 1) during the commission or attempted commission of a robbery, two counts of second degree robbery of Andrew Satterwhite and Robert Conrad, respectively (§§ 211, 212.5; counts 2 and 3), and vehicle theft (Vehicle Code § 10851(a); count 4). As to the robberies and vehicle theft, the information further alleged a criminal street gang enhancement (§§ 186.22(b)(1)(c)).

---

[1] Unless otherwise specified, further statutory references are to the California Penal Code.

As to Salinas, the information alleged that he used a deadly weapon -- a bottle -- during the commission of one of the robberies in court 2 (§12022(b)(1)), and that, in connection with counts 1, 2 and 3, he had a prior serious felony conviction that also constituted as a strike (§§ 667(a), 1170.12, 1192.7(c)).

The California Court of Appeal set out the facts to be as follows:

### The Trial Evidence

### The Current Offenses

Andrew Satterwhite, who was 17 years old in October 2005, testified under a grant of immunity[2] that on the evening of October 8, 2005, he and Robert Conrad walked through Boggini Park on their way home from a friend's house. It was dark, but they could see a group of 10 to 20 men by the picnic tables in the park. One of the men asked them, "'Why are you coming up on us?'" Satterwhite responded, "'It's not like that.'" The man asked, "'What do you claim?'" Satterwhite thought that the man was asking him if he was in a gang, so he responded that he didn't claim anything. The group of men surrounded Satterwhite and Conrad and one of the men shook Satterwhite's hand and said "'It's Norte.'" The man then told Satterwhite and Conrad to empty their pockets and said "'It's Capitol Park.'"

A man hit Satterwhite in the left eye and in the mouth and broke a 40-ounce beer bottle over his head. His head started bleeding and he fell to the ground. While reaching towards his back waistband, the man said, "'Don't make me get the gun.'" The man took off the Larry Bird Celtics jersey, the white T-shirt, and the white Nike shoes that Satterwhite was wearing. The group of men started running away so Satterwhite and Conrad ran in the opposite direction. Although Satterwhite saw a police car nearby, he did not run towards it because he wanted to go home. His parents reported the incident to the police.

Satterwhite went to the Regional Medical Center where he received six staples in his head and stitches on his right arm for cuts from the broken beer bottle. While he was at the hospital, he told officers that a man who hit him had "San Jo" tattooed on his neck. Officers brought Satterwhite's shoes and Conrad's Raiders jersey to Satterwhite and he identified them. Officers also showed him two men. Satterwhite thought that one of the men looked like the man who hit

_____

[2] Satterwhite denied participating in a burglary of Norwood Elementary School with Conrad in October 2005. He admitted participating in a commercial burglary in January 2006 after taking his mother's car without her permission. He spent some time in juvenile hall for the burglary, during which time he was threatened because of the incident at issue here. He was later granted probation and one of the terms of his probation was that he remain in California. However, he left the state, is residing in Nevada, and did not contact his probation officer upon his return to the state while under subpoena. The grant of immunity allowed him to testify without having to contact his probation officer or being arrested for violating his probation.

United States District Court
For the Northern District of California

him with the beer bottle and then took his jersey.[3]  He was asked to, but could not, identify a man who at the time was lying on a hospital stretcher.

Conrad,[4] who was 17 years old at the time of trial, testified that on October 8, 2005, while he and Satterwhite were walking through Boggini Park around 9:30 p.m. on their way home from a friend's house, they were stopped by a group of about 20 men. It was dark but at first the group seemed to be friendly and somebody shook Satterwhite's hand. The men then said, "'What's up,'" and had Conrad and Satterwhite sit down at a picnic table because the men did not know them. Conrad's black New York Yankees baseball cap was hit off his head and the men told Conrad and Satterwhite to empty their pockets. Conrad took a brush, a washcloth, and some papers and keys from his pockets.

The men told Satterwhite to take off his jersey. When Satterwhite did not comply, he was hit in the head with a bottle, thrown to the ground, and his jersey and shoes were taken off him. Somebody hit Conrad on the back of his head, slamming it onto the picnic table. Because of all of this, Conrad decided to do whatever the men asked him to do. He removed his Porter Raiders jersey. Somebody pulled his T-shirt, chain and "R" pendant off him, so he removed his earrings. When the group of men left them, Conrad and Satterwhite ran out of the park. They went to a friend's house and discussed the incident before going home. Conrad did not report the incident to the police.

San Jose Police officers Stanley Gaspar and Melinda O'Neil were dispatched to Boggini Park around 9:23 p.m. on October 8, 2005, due to a 911 report that there were 20 to 30 people in the park, that there might be fight, and that there were threats of a shooting. When the officers arrived around 9:26 p.m., Gaspar saw people running through the park and vehicles driving away in all directions, some with their headlights off. Gaspar and other officers contacted a group of six to eight people at the park and pat searched them for weapons. While O'Neil was assisting Gaspar, she was notified around 9:35 p.m. that there was a fatal accident involving a van at Quimby and Tully Roads. O'Neill left for the accident scene, where she interviewed witnesses. After Gaspar ensured himself that nobody in the park had a weapon and that nobody was hurt, he also responded to the accident scene. Officer Catherine Foley, who had been dispatched to Boggini Park at 9:27 p.m., left the park for the accident scene around the same time as Officer Gaspar.

Officers Kendra Spath, James Gonzalez and Michael Clark were dispatched to Boggini Park at 9:31 p.m. on October 8, 2005. While Officers Spath and Gonzalez were eastbound on Quimby Road, a blue minivan sped westbound past them with its headlights off. The dispatcher broadcast that a vehicle matching the description of the minivan had just been stolen. Spath reported that she had seen the minivan traveling westbound on Quimby Road, but she and Gonzalez did not attempt to follow the minivan. Before they arrived

---

[3] Satterwhite could not identify Salinas at trial as the man who he identified at the hospital. However, he testified that he was afraid to testify and was concerned that "people" would find out where he lived.

[4] Conrad admitted participating in a burglary at Norwood Elementary School in 2005, and testified that he was on probation as a result of the burglary and that Satterwhite also participated in the burglary. The parties stipulated that the school incurred damages in excess of $400, and that the conduct causing the damages qualifies as a felony.

United States District Court
For the Northern District of California

at Boggini Park, Spath and Gonzalez were redirected to an injury accident at Tully and Alvin,[5] so they turned around and headed westbound on Quimby. When they arrived at the intersection of Quimby and Tully,[6] the blue minivan they had seen earlier was wrapped around a signal pole on the west side of the intersection.  Spath reported the accident.

Officer Clark was eastbound on Tully Road on his way to Boggini Park when he was dispatched to an injury accident at Tully and Alvin.  He turned around and headed westbound on Tully toward Alvin.  However, when he reached Quimby, he saw a blue minivan wrapped around a pole and on fire.  He had previously heard from dispatch that a blue minivan had been reported stolen. He reported the accident, including the license plate of the minivan.  He then checked the minivan for any occupants and tried to put out the fire with his fire extinguisher, but was not able to put it out.

On the evening of October 8, 2005, Rigoberto Cardenas drove his blue Ford minivan to his sister-in-law's house on Castleton Drive near Quimby Road in San Jose.  He parked in the driveway and left his keys in the ignition and the engine running when he went inside.  The minivan was gone within a few minutes and he had not given anyone permission to take it.  The theft was reported to 911.  About 30 minutes later the police notified Cardenas that they had found the minivan.  They called again around 2:00 or 3:00 a.m. the next day, at which time Cardenas went to the intersection of Tully and Quimby Roads where he found the minivan "smashed." Inside the minivan were several items that did not belong to Cardenas.

Around 9:30 p.m. on October 8, 2005, Quyen Tiet witnessed a collision at the intersection of Tully and Quimby Roads.  Tiet was on Tully Road about one-half block from the intersection when a minivan sped past him.  The minivan accelerated towards the intersection as the stoplight was turning red, entered the intersection on the red light, and hit the driver's side of a car.  Tiet thought he saw four people get out of the minivan.  He called 911.

Antonio Gomez and Liliana Baez were on Tully Road slowing down for the stoplight at Quimby Road when they witnessed the collision.  When the light turned green for Quimby Road, a red Honda Civic started into the intersection. A minivan with its headlights off sped past Gomez and Baez, entered the intersection on the red light, hit the driver's side of the Honda, and then hit a pole.  The Honda spun and came to rest between 80 and 110 feet away.  Gomez and Baez saw two men get out of the driver's side of the minivan and run towards a shopping center.  Gomez pulled over, got out of his car, and yelled at the men to stop.  The two men stopped for a moment then continued on.  Gomez and Baez saw a third man get out of the passenger side of the minivan.  Gomez was able to stop the third man, who collapsed, and Gomez dragged the man over to the sidewalk.  Gomez then checked on the two occupants of the Honda.  He got no response from the woman driver; the male passenger drifted in and out of consciousness.  Baez identified photos of Salinas and Joseph Vargas as two

---

[5] Alvin is the last intersection on Tully Road before the eastside entrances to Highway 101.

[6] At the intersection of Quimby and Tully Roads, Tully runs from the northeast to the southwest towards Highway 101, and Quimby runs from the southeast to the northwest through Tully.

of the men who got out of the minivan after the collision. Gomez identified a photo of Vargas as the man he stopped after he got out of the passenger side of the minivan, and a photo of Salinas as one of the two men who got out of the driver's side of the minivan and ran away.

Sandra Ramirez was with her son in a car on Quimby Road at the Tully Road stoplight when the collision occurred. She did not see the minivan hit the red Honda, she just heard the noise and saw the aftermath of the collision. The minivan came to rest against a traffic signal post. She saw two men jump out of the minivan but she did not see where they went. Her son got out of their car, ran to the Honda, and quickly ran back. He said that it looked like a woman was dead. Ramirez called 911.

Officer Foley prepared the accident report for the collision. Myra Aguirre was identified as the deceased driver of the Honda and Hugo Garcia was identified as the injured passenger. Aguirre died instantly as a result of blunt impact to her head and torso which caused both her brain stem and her aorta to sever. Aguirre also sustained fractures of her ribs, left arm bone, both leg bones, and skull, and abrasions throughout her body. Garcia was taken from the scene of the collision in an ambulance. He had lacerations above both eyes and on his right leg.

Two bags of items were taken from the minivan to the Regional Medical Center and shown to Satterwhite. Satterwhite identified his shoes and Conrad's jersey. He was not able to identify the black Nike shoes, a black T-shirt with "408" written in red, or a black hat. Five white T-shirts and a New York Yankees hat were found on the front passenger floorboard of the minivan on October 11, 2005, after the minivan was taken to the police storage lot.

Officer Kevin Cassidy testified as a collision reconstruction expert that the minivan was approximately 392 feet from the intersection when the signal turned red, and that he did not find any evidence that the driver of the minivan applied the brakes prior to entering the intersection. The minivan struck the Honda before the Honda was halfway through the intersection. At the time of collision, the Honda was traveling about 18 miles per hour and the minivan was traveling about 58 miles per hour.

After arriving at the scene of the accident, Officer Joseph Freitas was directed to go to school grounds north of the accident scene in order to look for the men who had fled from the minivan. He was then directed by a witness to a pickup truck parked in a bakery parking lot. Officer Freitas found Salinas lying face down underneath the pickup truck and several officers ordered Salinas out from underneath the truck. Salinas complied with the orders and was taken into custody. Salinas, an admitted Norteño gang member, had a tattoo of an "X" and a "4" behind his left ear, "EHP" tattooed on his left leg just above the knee, four dots along the knuckles of one hand and a single dot along one of the knuckles of his other hand. His nose was bleeding and he had abrasions on his chest, face, and hands, lacerations on his forearms, and glass fragments in his hair and face. An officer transported Salinas to the police department where a blood sample and pictures of Salinas's injuries were taken. The officer then transported Salinas to Regional Medical Center for viewing by an assault victim.

Around 1:30 a.m. on October 9, 2005, officers were dispatched to the crime scene at Boggini Park. On or around a picnic table in the middle of the park they found a broken glass beer bottle, some blood, a pair of white Nike

shoes, a pair of red knit gloves, a key with a blue coil, a lighter, a white wash cloth, a $5 bill, and some jewelry.  The jewelry consisted of two earrings, a chain necklace, and an "R" pendant.

Madril's family took him to Valley Medical Center on the night of October 8, 2005.  Lisa Delatorre,[7] Madril's sister, heard from family members that Madril might have been in a car accident that night and saw that Madril had bruises on his leg and head, and that his tongue was cut and swollen.  Lisa told her husband Ricardo that Madril might have been in a car accident.  When Ricardo later learned that the woman who was killed in a car accident that night was one of his niece's friends, he called the police.  Ricardo told the police that Madril had been in the hospital due to injuries he received on the night of October 8, 2005, and that the injuries might have been caused by the car accident that occurred on Tully Road.  Lisa told the police that Madril told her that he had been in a car accident on Tully Road and that he had fled from the accident because he had been in a stolen car.  Lisa also said that Madril was flashing what she believed were gang signs while he was in the hospital waiting area, and that it upset her.

Madril and Rachel Acosta, his mother, stayed overnight at her nephew's house after Madril was released from the hospital.  Although Acosta asked Madril how he was injured, Madril did not respond.  The next day, Madril wrote Acosta a note asking her to take him to the home of his girlfriend Christina Balandra in Tracy.  Acosta took him there.  Madril was arrested at Balandra's home on October 13, 2005.  At the time, Madril was wearing a red T-shirt.  An admitted Norteño gang member, Madril has "X4" tattooed in red on one of his fingers.  He also has "ESSJ," standing for East Side San Jose, "Norte," and "408" within a Huelga Bird tattooed on his left forearm.

On the night of October 8, 2005, Kristopher Bal heard about the incident in which Satterwhite's jersey was stolen.  About an hour after learning about the incident, Bal called the phone number of his friend Jorge Trejo's cell phone.  Trejo was a Norteño gang member.[8]  Somebody Bal did not recognize answered the phone.  A few minutes after their conversation, a Black man named Timothy brought Bal a bloody white Larry Bird Celtic's jersey, Trejo's cell phone, and the jacket Bal had loaned to Trejo earlier that night.  The man said that he had found the items in the park, and Trejo later told Bal that he had been in Boggini Park.  Bal identified the black Nike shoes taken from the minivan on October 8, 2005, as belonging to his friend Artie, and the black hat with the red Huelga bird as the hat that he had loaned to Trejo along with his jacket.

On October 13, 2005, Conrad was shown a photographic lineup.  He identified Salinas as the man who smashed the beer bottle over Satterwhite's head.  He could not identify the black hat, the black T-shirt with the red number "408," or the black shoes that were found in the minivan.

Vargas, who was 17 years old in October 2005 and "claimed" Norteño,

---

[7] We will hereafter refer to Lisa and Ricardo Delatorre by their first names for ease of reference, and do not intend any disrespect.

[8] Trejo died three days after the incident at issue here after he was hit by a car at an intersection.

testified pursuant to a plea agreement[9] that he was at Boggini Park with 15 to 20 other people on the night of October 8, 2005. It was dark, and he drank malt liquor, smoked marijuana, and talked with others in the group. Salinas and Madril were part of the group. After about 15 or 20 minutes, around six teenagers came up to the group and asked for cigarettes. Members of Vargas's group asked the teenagers where they were from and if they "claimed." The teenagers said that they do not claim and then everybody shook hands. They were leaving when Salinas, while putting his right hand behind his back as though he was going to pull out a gun, told the teenagers to sit down on a picnic bench or they would get shot. Salinas also yelled, "'Capitol Park.'" The teenagers sat down.

The men in Vargas's group told the teenagers to empty their pockets and to put the items on the picnic table. Salinas looked through the items and slapped each of the teenagers on the head. He hit one of the teenagers on the head with a 40-ounce beer bottle, grabbed him, threw him on the ground, and took his jersey. Madril went through the wallets on the table, then hit and kicked a different teenager and took off his shirt. Vargas watched but did not intervene. Salinas told Vargas to pick up "the pile" and then the group ran off. Vargas picked up the shirts and jerseys that were on the ground and followed Salinas, Madril, and a teenaged member of his group. About one block from the park, the four of them stopped and Salinas told Vargas to call his friend to come pick them up. Vargas tried calling his friend while they continued walking. When they saw an empty van parked with its engine running, Salinas told them to wait and then ran to the van, jumped in, and drove it back to them. Vargas jumped into the front passenger seat of the van with the items he had grabbed at the park and Madril and the teenager jumped into the back.

Salinas sped off and turned onto Quimby Road without stopping at stop signs. Vargas told Salinas to slow down but Salinas told him to shut up. Salinas sped through a red light at White Road. Vargas saw two patrol cars heading in the opposite direction, and Madril said that "cop cars" were there. Salinas said, "'I got it,'" drove faster, and turned onto Capitol Expressway. He continued speeding and turned onto Tully Road, running another red light. He continued speeding on Tully Road so Vargas put his seat belt on because he thought they were going to run into something. Vargas saw a red light at an intersection ahead of them but did not feel Salinas step on the brakes or swerve. The van hit a red car and then hit a pole. Vargas heard doors open but he did not see where Salinas, Madril, or the teenager went. Vargas climbed out a window because his door was jammed, and then he collapsed and crawled to the sidewalk. The police and paramedics came and he was taken to the hospital by ambulance.

An officer took Vargas into custody at the Regional Medical Center and transported him to Juvenile Hall. The officer also collected Vargas's clothes and booked them into evidence. Blood samples taken from Vargas around 11:15 p.m. on the night of the incident tested negative for alcohol, but the samples were not tested for marijuana. Madril's blood was found on the passenger-side airbag and the passenger seat armrest in the minivan. Madril and Salinas were possible contributors of DNA found on the driver's side airbag and Salinas and

---

[9] Vargas was originally charged with murder, two counts of robbery, and vehicle theft. In exchange for testifying truthfully at trial, he admitted the two counts of robbery and the remaining charges were dismissed. In addition, Vargas admitted having a 2004 conviction for possessing marijuana for sale.

Vargas were possible contributors of DNA found on the steering wheel.

### The Gang Evidence

San Jose Police Detective Christopher Dominguez testified as an expert in the operation, activities, and membership of Hispanic criminal street gangs that, in San Jose, gang members predominately align with Norteño gangs. Currently, there are around 40 different Norteño street gangs in San Jose, organized around the various geographic areas of the city. Members of the different Norteño gangs will often associate or "hang out" with each other. Norteños identify with the color red and the number 14. They act out against Sureño gang members, who identify with the color blue and the number 13, as well as against people who are not gang-affiliated. Norteños will steal somebody's clothing, such as a shirt or cap, as an act of intimidation or humiliation. When an individual Norteño gang member commits an assault or robbery, other gang members present are expected to support or assist in whatever way necessary, including helping the individual get away afterwards. San Jose Police Sergeant Shawny Williams testified as an expert in the operation, membership, and criminal activities of Hispanic street gangs that El Hoya Palmas is a San Jose Norteño gang. Norteño gang members identify with the color red and the number 14. The black T-shirt with the number "408" in red and the black hat with a red Huelga Bird found in the minivan are consistent with the types of clothing that Norteño gang members wear. The Huelga Bird is associated with Norteño gangs as well as with the United Farm Workers. Norteño gang members view people wearing clothing consistent with Norteño gangs but denying Norteño gang membership as disrespectful and would take action against them. If a gang member took the clothing off such a person it would enhance the gang member's reputation within the gang.

Detective Dominguez testified that the El Hoya Palmas gang had approximately 45 members on the east side of San Jose in 2005. One of the primary activities of the gang was the commission of crimes listed in section 186.22, subdivision (e). In Detective Dominguez's opinion, based on Salinas's tattoos and his police contacts, Salinas is a member of El Hoya Palmas. East Side San Jose is an ongoing Norteño criminal street gang with approximately 300 members. One of its primary activities has been the commission of crimes identified in section 186.22, subdivision (e). In Detective Dominguez's opinion, based on Madril's tattoos and admissions, Madril is associated with East Side San Jose. Also in Detective Dominguez's opinion, the theft of Satterwhite's and Conrad's clothing and property and the physical force used against them was done in association with other gang members and was for the benefit of a gang.

### The Verdicts and Findings on the Prior, the Romero Motion, and Sentencing

On January 29, 2007, the jury found both defendants guilty of first degree murder during the commission or attempted commission of a robbery (§ 187; count 1), two counts of second degree robbery (§§ 211, 212.5, subd. (c); counts 2 & 3), and vehicle theft (Veh. Code, § 10851, subd. (a); count 4). The jury found true the allegations that Salinas personally used a deadly and dangerous weapon, a bottle, during the commission of count 2 (§ 12022, subd. (b)(1)), and as to both defendants that counts 2 through 4 were committed for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)(1)), but found not true the gang allegations as to count 1. On January 30, 2007, Salinas waived his right to a jury trial on his alleged priors and, after a court trial, the court

8

1    found true the allegations that Salinas had a prior serious felony conviction that
2    also qualified as a strike (§§ 667, 1170.12).  On March 23, 2007, the court
     sentenced Madril to state prison for the indeterminate term of 25 years to life
3    consecutive to the determinate term of 13 years.  The determinate term consists
     of the midterm of three years on count 2, plus 10 years for the gang
     enhancement, with a concurrent total term of five years on count 4.  The court
4    stayed the total term of 13 years on count 3 pursuant to section 654.

5          On April 16, 2007, Salinas filed a request that the court strike his strike
     under section 1385 and [People v. Superior Court (Romero) (1996)] . . . 13 Cal.
6    4th 497.  On April 23, 2007, after hearing argument from both parties, the court
     denied Salinas's request and sentenced him to the indeterminate term of 55 years
7    to life consecutive to the determinate term of 22 years.  The indeterminate term
     consists of double the term of 25 years to life for count 1 plus five years for the
8    prior serious felony enhancement.  The determinate term consists of six years,
     or double the midterm, for count 2, plus 10 years for the gang enhancement, one
9    year for the weapon enhancement, and five years for the prior serious felony
     enhancement, and a concurrent total term of seven years for count 4.  The court
10   stayed a total term of 16 years on count 3.

11   Cal. Ct. App. Opinion, ¶. 3-15 (footnotes in original).

12

13   II.    Procedural History

14          Salinas was sentenced under California's Three Strikes Law[10] and, as mentioned above, he

15   received a longer sentence consisting of 55-years-to-life in prison  (on count 1), consecutive to

16   a determinate term of 22 years (for counts 2 and 4).  He was found to have suffered one prior

17   conviction that counted as a strike under the Three Strikes Law.

18          Salinas' conviction was affirmed by the California Court of Appeal.  The appellate court

19   modified Salinas' judgment by ordering the sentence imposed on the vehicle theft count stayed

20   pursuant to section 654.

21          Salinas also filed a habeas corpus petition in the appellate court, which that court ordered

22   considered with the appeal.  In that petition, Salinas sought a resentencing hearing.  The

23   appellate court denied his petition in a separate order.

24          Salinas filed a petition for review in the California Supreme Court, which was summarily

25   denied.

26

27          [10] California's Three Strikes Law consists of two almost identical statutory schemes -- one
     adopted by initiative and the other passed by the legislature -- that allow harsher sentences for
28   defendants who are convicted of felonies and have previously been convicted of one or more
     serious or violent felonies.  See Cal. Penal Code §§  667, 1170.12.

1    Salinas then filed this federal habeas corpus action on May 17, 2010.  In his petition,

2  Salinas alleges the following due process claims: (1) the trial court failed to instruct on theft as

3  a lesser-included offense of robbery; (2) the trial court failed to instruct on gross vehicular

4  manslaughter while intoxicated and/or on vehicular manslaughter; (3) the trial court erred in

5  convicting him of first degree felony murder, "because the homicide was too attenuated from the

6  felony," petition, p. 6j; (4) the trial court erred in the use of the pattern jury instruction, CALJIC

7  No. 2.11.5, regarding unjoined perpetrators of the same crime, which also violated his rights to

8  confront witnesses; and (5) there was insufficient foundation and/or insufficient evidence of the

9  "primary activities" element of the street gang enhancement, id. at 6p.  The court determined that

10  Salinas' claims appeared to be cognizable in a federal habeas action and issued an order to show

11  cause on June 14, 2010.

12    Respondent filed an answer to the petition.

13    Salinas' traverse was due on October 10, 2010; however, to date, he has not filed his

14  traverse.  The case is now ready for review on the merits.

16                              **JURISDICTION AND VENUE**

17    This court has subject matter jurisdiction over this habeas action for relief under 28

18  U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged

19  action concerns a conviction obtained in Santa Clara County, which is in this district.  See 28

20  U.S.C. §§ 84, 2241(d).

22                                    **EXHAUSTION**

23    Prisoners in state custody who wish to challenge collaterally in federal habeas

24  proceedings either the fact or length of their confinement are required first to exhaust state

25  judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

26  highest state court available with a fair opportunity to rule on the merits of each and every claim

27  they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that

28  state court remedies were exhausted for the claims asserted in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

I.   Failure to Instruct on Lesser Offense

   A.   Theft

Salinas contends the state court erred in failing to instruct the jury on theft as a lesser included offense of robbery.

The California Court of Appeal described the factual background of this claim as follows:

> Salinas requested that the court instruct the jury on petty theft as a lesser included offense of the robberies charged in counts 2 and 3. He contended that the jury could find that Satterwhite and Conrad's property was still in the park when they left the park, and that it was then taken by people who had knowledge that they had no right to the property: "We have recently possessed stolen property, or property that one person claims is his, some of which is found in the possession of the defendants later on, there has to be some explanation for that; and if that is the case, the jury could infer that there was a theft that occurred. But if the exertion of force doesn't occur in order to effectuate taking of the property, it's not a robbery; it's a theft."
>
> The prosecutor argued that there was no evidence to support a finding of after-acquired intent to take the property: "There was no witness to say that after they left the park, the defendants remained behind and then somebody decided let's take the property. [¶] The evidence that we did have was the victims' testimony that it was taken from them; that the defendants left, that they were then able to leave and they left . . . . Vargas testified that he was told as items were being taken, before the defendants scrambled away and before the victims ran away, he was told, get the stuff; get the property." Madril submitted the matter without argument.
>
> The court ruled, based on its "recollection of the evidence, based on the arguments and comments I heard this afternoon," that the evidence did not support giving a lesser included offense instruction as to theft on counts 2 or 3.

Cal. Ct. App. Opinion, p. 15.

Salinas claims that there was evidence which suggested that "this was only an assault, with the intent to steal formed after the assault terminated." Petition, p. 6a. He adds that "there was more than enough evidence for the jury to conclude that this was not a real robbery," including the following: "Too much stuff was left behind. The boston Celtics Larry Bird jersey was returned. The value of the items found in the van after the accident was de minimis . . . . Vargas said there were six purported victims, but Satterwaite and Conrad said there were only two." Id. at 6f. Salinas adds, "Money was left behind, including a $5 bill . . . [and] jewelry." Id. at 6e.

The California Court of Appeal rejected Salinas' argument that the trial court erred in failing to instruct on theft, stating:

> It is well settled that theft is a lesser included offense of robbery, which includes the additional element of force or fear. (People v. Ortega (1998) 19 Cal.4th 686, 694; People v. Melton (1988) 44 Cal.3d 713, 746.) """[A] defendant has a constitutional right to have the jury determine every material

issue presented by the evidence . . . ." [Citations.]' [Citation.] 'To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present.' [Citation.] Conversely, even on request, a trial judge has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction. [Citation.] "'Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." [Citation.]' [Citation.]" (<u>People v. Cunningham</u> (2001) 25 Cal.4th 926, 1007-1008.)

It is not error to refuse a defendant's requested instruction on a lesser included offense when there is no substantial evidence that would have supported a conviction of the lesser offense. (See <u>People v. Neely</u> (1993) 6 Cal.4th 877, 897; <u>People v. Marshall</u> (1996) 13 Cal.4th 799, 848-849.) "Speculation is insufficient to require the giving of an instruction on a lesser included offense. [Citations.] In addition, a lesser included instruction need not be given when there is no evidence that the offense is less than that charged. [Citation.]" (<u>People v. Mendoza</u> (2000) 24 Cal.4th 130, 174.)

The record in this case shows that Satterwhite and Conrad testified that they were assaulted and threatened after they failed to obey a demand that they empty their pockets. Satterwhite testified that his jersey was taken from him after he was hit over the head with a beer bottle and thrown to the ground. Conrad testified that he took off his own jersey after seeing what happened to Satterwhite. Vargas testified that Satterwhite and Conrad were told to empty their pockets after defendants threatened them, and that Satterwhite was told to take off his jersey after being hit over the head with a beer bottle and being thrown to the ground. Satterwhite and Conrad testified that the group of men from the park left the park before they did. Vargas testified that Salinas told him to grab "the pile" before the group fled from the park, and that he just grabbed the items that were on the ground and he left the items that were on the table.

Defendants argue that the record supports a finding that Satterwhite and Conrad were acting like gang "wannabees," thus the encounter in the park was between gang members and gang "wannabees," and that Satterwhite and Conrad testified at trial that they were robbery victims in an effort to hide the fact that they were gang "wannabees." Defendants further argue that because Vargas did not take all of the items from the park and Satterwhite's jersey was voluntarily returned, the jury could have found that whoever took the items had no intent to permanently deprive the victims of them. However, this is mere speculation and is insufficient to require the giving of an instruction on the lesser offense of theft. (<u>People v. Mendoza</u>, <u>supra</u>, 24 Cal.4th at p. 174.) The record is clear that the items were taken from the victims by use of force or fear. There was no evidence that the offenses were less than that charged, that is, that they were theft rather than robbery. No error or due process violation has been shown.

Cal. Ct. App. Opinion, ¶. 16-17.

Salinas' federal due process claim based on the failure to instruct has no merit because there is no clearly established federal rule that a trial court must instruct on all lesser included offenses. Although instructions on lesser included offenses must be given in capital cases, <u>Beck</u>

v. Alabama, 447 U.S. 625 (1980), "[t]here is no settled rule of law on whether <u>Beck</u> applies to noncapital cases such as the present one.  In fact, this circuit, without specifically addressing the issue of extending <u>Beck</u>, has declined to find constitutional error arising from the failure to instruct on a lesser included offense in a noncapital case." <u>Turner v. Marshall</u>, 63 F.3d 807, 819 (9th Cir. 1995), <u>overruled on other grounds by</u> <u>Tolbert v. Page</u>, 182 F.3d 677, 685 (9th Cir. 1999) (en banc).  The failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim.  See <u>Solis v. Garcia</u>, 219 F.3d 922, 929 (9th Cir. 2000), <u>cert. denied</u>, 534 U.S. 839 (2001); <u>Windham v. Merkle</u>, 163 F.3d 1092, 1105-06 (9th Cir. 1998).

Even though there is not a constitutional right to lesser included instructions, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule." <u>Solis</u>, 219 F.3d at 929 (citing <u>Bashor v. Risley</u>, 730 F.2d at 1240).  <u>Solis</u> suggests that there must be substantial evidence to warrant the instruction on the lesser offense.  See <u>Solis</u>, 219 F.3d 929-30 (no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice); <u>see also</u> <u>Cooper v. Calderon</u>, 255 F.3d 1104, 1110-11 (9th Cir. 2001) (no duty in death penalty case to instruct on second degree murder as a lesser included offense because the evidence established that the killer had acted with premeditation, so if the jury found that the defendant was the killer, it necessarily would have found that he committed first degree murder).  This exception is inapplicable because Salinas has not rebutted the state court's finding that there was no substantial evidence of theft instead of robbery.  As stated above, there was substantial evidence to support a finding of robbery because the record shows that Salinas and his cohorts attacked Satterwhite and Conrad and demanded their property.  Accordingly, Salinas' constitutional rights were not violated by the state court's failure to instruct on theft as a lesser included offense, and he is not entitled to habeas relief based on this claim.

B.      <u>Gross Vehicular Manslaughter While Intoxicated and/or Vehicular Manslaughter</u>

Salinas also contends the state court erred in failing to instruct the jury on the lesser-

United States District Court
For the Northern District of California

related offenses of gross-vehicular manslaughter while intoxicated and/or vehicular manslaughter.

The California Court of Appeal described the factual background of this claim as follows:

> In addition to giving the jury general instructions on homicide and murder (CALJIC Nos. 8.00, 8.10, 8.11) the court instructed the jury on felony-murder during the commission of a robbery (CALJIC Nos. 8.21 and 8.21.1), second degree murder (CALJIC Nos. 8.30 and 8.31), and both voluntary and involuntary manslaughter (CALJIC Nos. 8.37, 8 .40, 8.45, 8.46, 8.50, 8.51, 8.55). Salinas requested that the court also instruct the jury on vehicular manslaughter not involving drugs or alcohol (CALJIC No. 8.90) and gross vehicular manslaughter while intoxicated (CALJIC No. 8.93). The court denied the request, finding that vehicular manslaughter is a lesser related offense, not a lesser included offense, to the charged count of murder.

Cal. Ct. App. Opinion, p. 18.

Salinas claims that the "rules barring instruction on lesser related offenses do not impede" his claim that the state court erred and denied him due process by failing to give the requested aforementioned instructions.  Petition, p. 6i.

The California Court of Appeal rejected Salinas' argument that the trial court erred in failing to give the requested instructions on lesser related offenses, stating:

> Gross vehicular manslaughter while intoxicated may be a lesser related offense of murder, but it is not a lesser included offense.  (<u>People v. Sanchez</u> (2001) 24 Cal.4th 983, 992-993 (<u>Sanchez</u>).)  "Although it generally is true that manslaughter is a lesser included offense of murder, because generally manslaughter simply involves an unlawful killing of a human being without malice, gross vehicular manslaughter while intoxicated-like assault with a deadly weapon-requires proof of additional elements that are not included in the offense of murder or in other forms of nonvehicular manslaughter."  (<u>Id.</u> at p. 992.)  The same must be said about ordinary vehicular manslaughter.
>
> A criminal defendant has no right to requested instructions on lesser related offenses.  (<u>People v. Birks</u> (1998) 19 Cal.4th 108, 112-113.)  A contrary rule "can be unfair to the prosecution, and actually promotes inaccurate factfinding, because it gives the defendant a superior trial right to seek and obtain conviction for a lesser uncharged offense whose elements the prosecution has neither pled nor sought to prove."  (<u>Ibid.</u>)  "Under <u>Birks</u>, <u>supra</u>, 19 Cal.4th 108, trial courts can no longer instruct juries on such related, but not included, offenses without the prosecutor's permission."  (<u>People v. Martinez</u> (2002) 95 Cal.App.4th 581, 586.)  Here, the record reveals that the prosecutor objected to the giving of CALJIC Nos. 8.90 and 8.93, citing <u>Sanchez</u>.  Accordingly, the court did not err in refusing Salinas's request to instruct the jury with CALJIC Nos. 8.90 and/or 8.93.

Cal. Ct. App. Opinion, ¶. 18-19.

United States District Court
For the Northern District of California

1    The California Court of Appeal's holding was not contrary to, or an unreasonable

2    application of, clearly established federal law.  There is no clearly established federal law that

3    a trial court must instruct on lesser related offenses.  As mentioned above, the Supreme Court

4    held in Beck, that an instruction on a lesser included offense must be given in a capital case;

5    however, the law is unsettled as to whether such an instruction must be given in noncapital cases.

6    Turner, 63 F.3d 807, 819.  The Ninth Circuit  has declined to find constitutional error arising

7    from the failure to instruct on a lesser included offense in a noncapital case.  Id. (citing Bashor

8    v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984)).

9    Salinas' claim here concerns the duty to give an instruction on lesser related offenses.

10   The law on such duty is even more unsettled.  Federal law does not support Salinas' claim that

11   under this set of facts, a court must instruct on lesser related offenses.  To grant Salinas' claim,

12   therefore, this court would have to create a new rule.  In Teague v. Lane, 489 U.S. 288 (1989),

13   the United States Supreme Court held that, with a few exceptions not relevant here, a federal

14   court may not grant habeas corpus relief to a state prisoner based on a rule announced after his

15   conviction and sentence became final.  Here, Salinas' conviction and sentence have become final

16   and this court may not create a new rule requiring that an instruction on lesser related offenses

17   must be given.

18   Notwithstanding the lack of a specific rule requiring the court to instruct on lesser related

19   offenses, there is authority that habeas relief is available when the failure to instruct results in

20   a failure to instruct on the defendant's theory of the case or so infects the entire trial that the

21   resulting conviction violates due process.  See Conde v. Henry, 198 F.3d 734, 739 (9th Cir.

22   2000) (error to deny defendant's request for instruction on simple kidnaping where such

23   instruction was supported by the evidence).  This principle stems from the general rule from the

24   Supreme Court that habeas relief is available when an erroneous jury instruction so infects the

25   entire trial that the resulting conviction violates due process.  See Estelle v. McGuire, 502 U.S.

26   62, 72 (1991); Hendricks v. Vasquez, 974 F.2d 1099, 1106 (9th Cir. 1992) (citing Cupp v.

27   Naughton, 414 U.S. 141, 147 (1973)).  Even assuming that the Supreme Court source of this rule

28   would make it clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1), it

United States District Court
For the Northern District of California

1    would not support relief in this case.  A defendant does not have a right to have the jury hear his

2    specific proposed instruction on his theory of the case if other instructions, in their entirety,

3    adequately cover the defense theory.  Cf. Duckett v. Godinez, 67 F.3d 734, 743 (9th Cir. 1995).

4        Here, Salinas was able to and did argue that he was not guilty of the charged crime of

5    murder.  During Salinas' attorney's closing statements to the jury, she asked the jury to "come

6    back with a guilty of manslaughter as a felony, and guilty of auto theft as a felony."  RT 1849.

7        Salinas was able to discuss the instructions given relating to felony murder, CALJIC Nos.

8    8.10 and 8.11, 8.21, 8.21.1, which did require the finding the "unlawful killing of a human being

9    whether intentional, unintentional or accidental, which occurs during the commission or

10    attempted commission of the crime of [Robbery] is murder of the first degree when the

11    perpetrator had the specific intent to commit that crime," CT 880, and the instruction relating to

12    when a robbery is complete, which states: "A robbery is complete when the perpetrator has

13    eluded any pursuers, has reached a place of temporary safety, and is in unchallenged possession

14    of the stolen property after having effected an escape with the property," CT 881.  Thus, Salinas

15    was able to and did argue that the elements had not been proven -- specifically, that acquitting

16    Salinas of the counts of robbery "means there is no felony murder because the underlying felony

17    is not connected to the terrible accident."  RT 1888.  While "not conceding that a robbery

18    occurred," Salinas' attorney also argued that Salinas was entitled to a verdict of not guilty on the

19    felony- murder because "temporary safety had been reached" when "Andrew and Robert went

20    in one direction, Mr. Salinas and his group actually went off in the direction of Z's house, off to

21    the north end and to the west . . . ."  RT 1888-1891.

22        Salinas' attorney was also able to discuss the instructions on "malice murder versus

23    manslaughter."  RT 1894.  The jury instruction on "malice murder" or non-felony murder,

24    CALJIC No. 8.10, identified that following elements: (1) a human being was killed; (2) the

25    killing was unlawful; and (3) the killing was done with malice aforethought.  CT 879.  The jury

26    instruction on manslaughter, CALJIC Nos. 8.37, 8.40 and 8.45, identified elements that did not

27    include "malice aforethought," i.e., "[t]he crime of manslaughter is the unlawful killing of a

28    human being without malice aforethought" CT 886.  Finally, there was also a jury instruction

differentiating the two, CALJIC No. 8.50, which states: "The distinction between murder [other than felony-murder] and manslaughter is that murder [other than felony-murder] requires malice while manslaughter does not."

Salinas' attorney also discussed the definition of "malice," CALJIC No. 8.11:

> "Malice" may be either express or implied. Malice is implied when (1) The killing resulted from an intentional act; (2) The natural consequences of the act are dangerous to human life; and (3) The act was deliberately performed with knowledge of the danger to, and with conscious disregard for human life. When it is shown that a killing resulted from the intentional doing of an act with implied malice, no other mental state need be shown to establish the mental state of malice aforethought.

CT 883; RT 1895-1896. She also directed the jury to CALJIC No. 8.72, which states: "[i]f you are convinced beyond a reasonable doubt and unanimously agree that the killing was unlawful, but you unanimously agree that you have a reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of that doubt and find it to be manslaughter rather than murder." CT 898; RT 1895. She added that:

> in both the murder instruction and manslaughter instruction, there has to be a conscious disregard for human life. The difference between manslaughter and murder is that for it to be malice murder, the prosecution must prove beyond a reasonable doubt that this deliberate act was performed with knowledge of the facts in question.

RT1895. In applying the aforementioned instructions to the facts in Salinas' case, she argued as follows:

> If you run through a red light, you should know that a car could be there. You ought to know someone could get hurt, and you are disregarding the human safety that common sense tells you, you should slow down; but there is no knowledge of the fact in question, that is the difference. It hasn't been proven that that extra element of knowledge that's necessary for malice murder was present in this case.

RT 1899.

Salinas had no constitutional right to have the jury instructed in a way that was more likely to be helpful to him when the instructions given did allow him to argue his defense theory. The instructions allowed him to argue that he was not guilty of felony-murder or "malice murder" and, instead, guilty only of manslaughter. Furthermore, the record does not indicate that the absence of the instruction had a "'substantial and injurious effect or influence in determining

18

the jury's verdict.'" <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).  Accordingly, Salinas is not entitled to habeas relief based on this claim.

II.     <u>Murder Was Too Attenuated From Felony</u>

Salinas claims that the trial court "violated due process" by allowing the jury "to convict [him] of first degree felony murder, because the homicide was too attenuated from the felony." Petition, p. 6j.  Specifically, he argues that "[t]he combination of the prosecution's theory of robbery and its theory of felony-murder improperly stretched the felony-murder doctrine beyond reasonable boundaries." <u>Id.</u>  Though not entirely clear, Salinas also appears to argue the trial court erred in allowing the jury to "convict [him] of first degree murder based upon improper felony-murder instructions." <u>Id.</u> at 6L.

In his opening brief filed in the state appellate court, Salinas raised this argument in connection with his claim relating to failure to instruct on the lesser-related offenses of gross-vehicular manslaughter while intoxicated and/or vehicular manslaughter.  Salinas argued:

> There was substantial evidence that Appellant was not guilty of the charged crime of (felony) murder.  A reasonable jury could have concluded that the fatal vehicle crash was so attenuated from the robbery that the felony murder rule should not apply.  A reasonable jury could have concluded that the robbery was no longer in progress at the time of the vehicle accident, because the defendants had already escaped and reached a place of "temporary safety" within the meaning of CALJIC [No.] 8.21.1.

Salinas' Opening Br. Filed Cal. Ct. App., p. 24.  Because Salinas did not raise this claim separately, the appellate court did not separately respond to this argument; instead, it resolved his previous claim on the fact that there is no right to lesser related offenses.

In his petition for review filed in the state supreme court and in the instant petition, Salinas renews this argument under a separate heading, claiming that the application of the felony murder rule to these facts denies him due process because the murder was so attenuated from the felony.  As explained below, this court finds that this argument lacks merit.

California Penal Code § 189, which establishes the limits of felony murder, provides that a murder that is committed in the course of a robbery is felony murder in the first degree.  Cal.

United States District Court
For the Northern District of California

Penal Code. § 189.  A robbery is not considered complete if the "robbers had not won their way to a 'place of temporary safety' . . . ."  People v. Salas, 7 Cal.3d 812, 822 (1972) (quoting People v. Boss, 210 Cal. 245, 250 (1930); CALJIC No. 8.21.1.  "Whether a defendant has reached a place of temporary safety is a question of fact for the jury."  People v. Johnson, 5 Cal.App.4th 552, 559 (1992).  Here, the jury was instructed on this issue pursuant to CALJIC No. 8.21.1, which states:

> [For the purposes of determining whether an unlawful killing has occurred during the commission of a robbery, the] commission of the crime of robbery is not confined to a fixed place or a limited period of time.
>
> A robbery is still in progress after the original taking of physical possession of the stolen property while the perpetrator is in possession of the stolen property and fleeing in an attempt to escape.  Likewise it is still in progress so long as immediate pursuers are attempting to capture the perpetrator or to regain the stolen property.
>
> A robbery is complete when the perpetrator has eluded any pursuers, has reached a place of temporary safety, and is in unchallenged possession of the stolen property after having effected an escape with such property.

CT 881.  In Salas, the California Supreme Court made clear that "a fleeing robber's failure to reach a place of temporary safety is alone sufficient to establish the continuity of the robbery within the felony-murder rule."  7 Cal.3d at 823.  A state court's interpretation of state law binds a federal court sitting in habeas corpus.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005).  Under this rule, this court is bound by the state supreme court's interpretation of the felony murder rule.  See id.

In this case, Salinas argues that no robbery took place and instead, "the defendants beat the victims and harassed them to show gang power."  Petition, at p. 6j.  He adds that "most of the property taken from the victims was left behind in the park, includimg [sic] shoes, jewelry, and money . . . ."  Id.  He also points out that "[t]he most valuable and notable piece of clothing taken from the victims, the Boston Celtics Larry Bird jersey, was returned to the victim's friend that same night . . . ."  Id. at 6j-6k.  Thus, Salinas argues that "[t]hese facts tend to disprove the taking of any other property with the intent to permanently deprive."  Id. at 6k.  Furthermore, he argues that when "the defendants walked away from the scene . . . several blocks away . . . [t]hey arguably reached a point of temporary safety, within the meaning of CALJIC [No.]

8.21.1." Id. He adds, "When the defendants were on the sidewalk several blocks from the park, they arguably were in unchallenged possession of the stolen property, so as to cause the robbery to be deemed terminated, within the meaning of CALJIC [No.] 8.21.1." Id. He claims the "theft of the car occurred after the robbery had terminated," and "in any event, vehicle theft, [under] Vehicle Code § 10851, does not trigger the felony-murder rule." Id. In sum, he argues that "the felony and homicide were so attenuated from each other that this application of the felony-murder rule violated due process . . . ." Id. at 6l.

Contrary to Salinas' claims above, there is substantial evidence supporting the jury's finding that he was guilty of felony murder on the theory that robbery was still in progress because he had not reached a place of temporary safety at the time of the murder. The state appellate court reached this same conclusion in its analysis of Salinas' sentencing claim, stating:

> In this case, it is evident from the record that Salinas stole and drove the minivan in an effort to escape from the scene of the robberies. The record does not show that defendants had reached a location of temporary safety when Salinas took the minivan. Instead, the record shows that Salinas and Madril assaulted and robbed the teenagers in the park and stole the minivan outside the park while attempting to get away, as several police vehicles and officers were arriving at the park in response to reports of threats of violence there at the time the vehicle theft occurred.

Cal. Ct. App. Opinion, p. 26. Furthermore, the evidence establishes Salinas drove at high speeds and ignored traffic signals before the crash. His cohorts, Vargas and Madril, saw two police cars coming from the opposite direction. Madril informed Salinas that "cop cars" were there, and Salinas replied, "I got it." RT 975-976. Salinas then drove even faster and ran red lights until he crashed into the victim's car and, ultimately, into a pole. Everyone in the minivan continued to flee after the crash. Vargas attempted to run from the scene, but he collapsed and was arrested. Salinas was eventually captured. At that time, only Madril escaped.

Just as the state supreme court has made clear in Salas, here, Salinas' failure to reach a place of temporary safety "is alone sufficient to establish the continuity of the robbery within the felony-murder rule." Salas, 7 Cal.3d at 823. A reasonable jury could have concluded, from the facts above, that at the time of the killing, Salinas was fleeing from the crime scene at a high speed in a stolen vehicle used to effectuate his escape. At no point in time did he relax or find

a private location away from the scrutiny of the public or the police.  Accordingly, this court finds reasonable the state court's rejection of Salinas' due process claim relating to his argument that the murder was "too attenuated" from the felony.  Therefore, Salinas is not entitled to habeas relief based on this claim.

III.     Error in Instructing the Jury with CALJIC No. 2.11.5

Salinas claims that his rights to confront witnesses and to due process were violated by the use of the pattern jury instruction, CALJIC No. 2.11.5, regarding unjoined perpetrators of the same crime.  Petition, p. 6p.

The California Court of Appeal described the factual background of this claim, stating the following relating to the challenged instruction, CALJIC No. 2.11.5, and to Vargas, who testified as a prosecution witness under a grant of immunity, RT 943:

> Vargas testified that he was charged with murder, two counts of robbery, and vehicle theft in connection with the incidents at issue here and that, pursuant to a plea agreement involving his testimony at defendants' trial, he admitted the two counts of robbery and the remaining charges were dismissed.  Vargas further testified that he and a teenager who had been in the park during defendants' robberies were also in the minivan with defendants at the time Salinas drove through the red light and hit the Honda.  Other witnesses testified that they saw between two and four people get out of the minivan after it hit the Honda.

> The court stated on the record during the discussions regarding jury instructions that "[CALJIC No.] 2.11.5 will be given as modified."  At the close of trial, the court instructed the jury pursuant to CALJIC No. 2.11.5 as follows: "There has been evidence in this case indicating that a person other than a defendant was or may have been involved in the crime for which that defendant is on trial.  [¶]  There may be many reasons why that person is not here on trial.  Therefore, do not speculate or guess as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted.  Your duty is to decide whether the People have proved the guilt of each defendant on trial."  Neither an objection to the instruction as given nor a request by defense counsel for a limiting instruction appears in the record.

Cal. Ct. App. Opinion, p. 19.

Salinas contends that the trial court erred in giving CALJIC No. 2.11.5 without a limiting instruction that it did not apply to Vargas.  Salinas specifically states, "The Use Note for CALJIC [No.] 2.11.5, explicitly prohibits this instruction from being given if it pertains to a prosecution witness.  ('Do no use this instruction if the other person is a witness for either the

United States District Court
For the Northern District of California

prosecution or the defense.') ('Citations omitted')." Petition, p. 6m.  Salinas argues that CALJIC

No. 2.11.5 "effectively told the jury to ignore the question of whether Vargas fingered Salinas

for the robberies to save his own skin on those charges."  Id. at 6o.

The California Court of Appeal rejected Salinas' argument that the trial court erred in

failing to give CALJIC No. 2.11.5 without the limiting instructions, stating:

> The purpose of CALJIC No. 2.11.5 is to "discourage the jury from
> irrelevant speculation about the prosecution's reasons for not jointly prosecuting
> all those shown by the evidence to have participated in the perpetration of the
> charged offenses, and also to discourage speculation about the eventual fates of
> [unjoined] perpetrators."  (People v. Price (1991) 1 Cal. 4th 324, 446.)
> Generally, the instruction should not be given if the other person" who may
> have been involved testifies at trial because there is the possibility that CALJIC
> No. 2.11.5 could prevent a jury from considering the coparticipant's incentive
> to lie.  (People v. Hardy (1992) 2 Cal.4th 86, 189-190; People v. Cox (1991) 53
> Cal.3d 618, 667.)  Accordingly, where a coparticipant testifies and another does
> not, CALJIC No. 2.11.5 either should not be given or should be limited to
> preclude its application to the testifying coparticipant.  (People v. Cain (1995)
> 10 Cal.4th 1, 34-35, fn. 9; People v. Sully (1991) 53 Cal.3d 1195, 1218.)

> The California Supreme Court considered in People v. Jones (2003) 30
> Cal.4th 1084 (Jones) a version of CALJIC No. 2.11.5 that is similar to the
> version given by the trial court in the present case.  In Jones, the court stated,
> "[W]e have often said that trial courts should not give CALJIC No. 2.11.5 in an
> unmodified form when, as here, a person who might have been prosecuted for
> the crime has testified at trial.  [Citations.]"  (Jones, supra, at p. 1113.)
> However, the court also stated that although it is a "mistake" to give CALJIC
> No. 2.11.5 where an unjoined coparticipant has testified, the "mistake" is not
> "error when, as here, 'the instruction is given with the full panoply of witness
> credibility and accomplice instructions.'"  (Jones, supra, at p. 1114, quoting
> People v. Lawley (2002) 27 Cal.4th 102, 162.)

> The trial court in this case instructed the jury with CALJIC Nos. 2.20
> [believability of a witness], 2.23.1 [believability of a witness-past criminal
> conduct], 2.27 [sufficiency of testimony of one witness], 3.11 [testimony of
> accomplice must be corroborated], 3.12 [sufficiency of evidence to corroborate
> an accomplice], 3.13 [one accomplice may not corroborate another], 3.14
> [criminal intent necessary to make one an accomplice], 3.16 [witness accomplice
> as matter of law], and 3.18 [testimony of accomplice to be viewed with care and
> caution].  The court also instructed the jury to consider the instructions as a
> whole and to not single out one instruction to the exclusion of another.
> (CALJIC No. 1.01; see, e.g., People v. Sully, supra, 53 Cal.3d at ¶. 1218-1219;
> People v. Cox, supra, 53 Cal.3d at p. 667.)  As the instructions as a whole
> correctly instructed the jurors regarding Vargas's credibility, the jury was aware
> that Vargas had entered into a plea agreement regarding the same charges that
> were brought against defendant, and there was testimony that a fourth person
> was with Vargas and defendants during the robberies, vehicle theft, and fatal
> accident, we cannot say that the court erred in giving CALJIC No. 2.11.5
> without a limiting instruction.  (Jones, supra, 30 Cal.4th at p. 1114.)

Cal. Ct. App. Opinion, p. 19.

23

United States District Court
For the Northern District of California

1  Salinas' claim is without merit.  First, as explained above, the appellate court disposed of

2  this claim on state law grounds.  Thus, Salinas has not shown that this is a federal constitutional

3  claim, <u>Estelle</u>, 502 U.S. at 67-68, or that he has a clearly established right to preclude the trial

4  court from issuing such an instruction.  Second, even if Salinas has presented a federal claim,

5  CALJIC No. 2.11.5 merely restricts the jury from considering why a coparticipant is not on trial.

6  It does not forbid the jury from considering whether Vargas avoided trial by pleading out as part

7  of its credibility consideration.  Furthermore, the jury need not have considered why Vargas was

8  not on trial, because the jury was told that the he had avoided trial by entering into a pea

9  agreement regarding the same charges that were brought against Salinas.  Also, as the appellate

10  court pointed out, the trial court gave other instructions reminding the jury that it was duty-

11  bound to determine the credibility of all witnesses, and, as part of that consideration, should

12  consider the possibility of bias or interest.  CT 845, 849-850, 864-869.  Courts must presume that

13  jurors followed their instructions.  <u>See</u> <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987).

14  Accordingly, Salinas is not entitled to habeas relief based on this claim.

15

16  IV.   <u>Insufficient Evidence to Support Gang Enhancement</u>

17  Salinas contends that his right to due process was violated because there was insufficient

18  evidence to support the sentence enhancement he received for committing a crime for the benefit

19  of a criminal street gang.  Specifically, Salinas contends that there was insufficient evidence that

20  the commission of one or more enumerated crimes was one of the primary activities of the "El

21  Hoyo Palmas,"[11] the criminal street gang which he claims was his "supposed" gang.  Petition,

22  p. 6t.  He argues that "there [are] two separate failures of proof as to the 'primary activities'

23  elements of the gang enhancement, (1) that there was insufficient foundation for the [] gang

24  expert's opinion as to this element, and (2) that, absent the expert's opinion, there was

25  insufficient evidence of this element."  <u>Id.</u> at 6r.

26  California law provides for a sentence enhancement for crimes committed "for the benefit

27

28  [11] The state appellate court misspelled the gang's name as "El Hoya Palmas" in their
unpublished opinion.  The correct spelling is "El Hoyo Palmas."

of, at the direction of, or in association with any criminal street gang."  Cal. Penal Code § 186.22(b)(1).  The appellate court explained how to establish that a group is a criminal street gang within the meaning of the statute:

> the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]" (People v. Duran (2002) 97 Cal.App.4th 1448, 1457.) Accordingly, "[t]o trigger the gang statute's sentence-enhancement provision (§ 186.22, subd. (b)), the trier of fact must find that one of the alleged criminal street gang's primary activities is the commission of one or more of certain crimes listed in the gang statute." (People v. Sengpadychith (2001) 26 Cal.4th 316, 322 (Sengpadychith).)

Cal. Ct. App. Opinion, p. 21.

Salinas contends that there was insufficient evidence of the primary activity element required for the gang enhancement because the expert opinion by prosecution's gang expert, Detective Christopher Dominguez, on the issue lacked an adequate factual foundation.  In the instant petition, Salinas points to the testimony Detective Dominguez, when he was recalled by the prosecution, relating to "primary activities" of the El Hoyo Palmas gang:

> Q. [Prosecutor David Pandori]: Are -- how long have those -- how long has the umbrella group, El Hoyo Palmas, been in operation?
>
> A. [Detective Dominguez]: Approximately 15 years.
>
> Q.: And they are composed of three or more persons; correct?
>
> A.: Correct.
>
> Q.: You indicated some of the common signs and symbols.  My next question is, are you familiar with the list of crimes that are in Penal Code § 186.22(e)?
>
> A.: Correct; approximately 33 of those crimes.
>
> Q.: All right.  Is one of the primary activities of that gang commission of the crimes listed in that code section?
>
> A.: That's correct.
>
> Q.: Is the commission of those crimes one of the gang's chief or principal occupations?
>
> A.: That's correct.

RT 1608-1609.  Salinas argues:

United States District Court
For the Northern District of California

25

1
2
3

Although officer Dominguez gave this opinion, he did not identify any specific crime listed in in § 186.22(e) which he believed was a "primary activity" of the El Hoyo Palmas.  Nor did he identify any specific El Hoyo Palmas gang member committed any specific crime enumerated in that section, except for the two charged robberies.

4

Petition, p. 6s.

5

The state appellate court rejected Salinas' claim, stating:

6
7
8
9
10
11
12
13

"The phrase 'primary activities,' as used in the gang statute implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.]" (<u>Sengpadychith</u>, <u>supra</u>, 26 Cal.4th at p. 323.)  "Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities.  Both past and present offenses have some tendency in reason to show the group's primary activity . . . ." (<u>Ibid.</u>) However, such evidence alone is not necessarily sufficient to establish the gang's primary activities. (<u>Ibid.</u>) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute.  Also sufficient might be expert testimony, as occurred in [<u>People v.</u> <u>Gardeley</u> [(1996)] 14 Cal.4th 605 [(<u>Gardeley</u> )]." (<u>Sengpadychith</u>, <u>supra</u>, at p. 324.)

14
15
16
17
18
19

Defendants contend that Detective Dominguez's opinion testimony varied dramatically from that presented in <u>Gardeley</u>.  They argue that the expert in <u>Gardeley</u> gave his opinion that the primary activity of the relevant gang was the sale of narcotics, but that the gang also engaged in witness intimidation, both of which are offenses listed in section 186.22, subdivision (e).  They further argue that the expert in <u>Gardeley</u> testified that he based his opinion on conversations with the defendant and with other members of the gang, his personal investigations of hundreds of crimes committed by gang members, and information from his colleagues and various law enforcement agencies.  "In <u>Gardeley</u>, unlike here, the court knew both what information the expert was relying upon, and where that information originated . . . . [¶]  Here, there was none of the foundation for the expert's opinion called for in <u>Gardeley</u>."

20
21
22
23
24
25
26
27

We are not persuaded by defendants' arguments.  Detective Dominguez testified as a gang expert that both El Hoya Palmas and East Side San Jose were Norteño gangs in San Jose and that members of the gangs often associate with or "hang out" together.  Detective Dominguez further testified that Norteño gang members "act out" against non-gang members by intimidating them and by taking their property in order to show that they control the neighborhood; that when a gang member commits a crime such as assault or robbery the other gang members present are expected to support or assist them in whatever way necessary; that he has "countless times" spoken to people in the hospital, including both Norteño and Sureño gang members, who have been very badly beaten by a Norteño gang member; and that "[t]aking anything that you want from someone, part of the gang lifestyle, you see someone walking by, you want something, you take it.  It might be a shirt.  It might be shoes.  It might be a belt.  We've investigated, I think three cases where all they took was a baseball cap."

28

A gang expert's opinion can be based on hearsay evidence, including the expert's conversations with gang members, the expert's investigation of gang

United States District Court
For the Northern District of California

crimes, and the expert's conversations with other officers. (<u>Gardeley</u>, <u>supra</u>, 14 Cal.4th at ¶. 617-620.) The statute does not require proof of convictions, only proof that enumerated offenses were committed. (<u>In re Leland D.</u> (1990) 223 Cal.App.3d 251, 258.) Here, Detective Dominguez testified that, in his opinion, one of the primary activities of both the El Hoya Palmas Norteño gang and the East Side San Jose Norteño gang was the commission of crimes enumerated in section 186.22, subdivision (e). He testified that he investigated both assaults and robberies involving Norteño gang members, and both assault and robbery are offenses enumerated in section 186.22, subdivision (e). Thus, contrary to defendants' arguments, Detective Dominguez testified regarding what offenses the relevant gang members consistently and repeatedly commit, what information he was relying on, and where he got that information.

"'[E]ither prior conduct or acts committed at the time of the charged offenses can be used to establish the "primary activities" element of the gang enhancement.'" (<u>Sengpadychith</u>, <u>supra</u>, 26 Cal.4th at p. 323, quoting <u>People v. Galvan</u> (1998) 68 Cal.App.4th 1135, 1140.) Here, in addition to hearing testimony about prior acts committed by relevant gang members, the jury heard testimony that defendants, admitted gang members, robbed two teenagers in a park and then stole a vehicle in an attempt to get away, all in association with and for the benefit of their respective gangs. Both robbery and vehicle theft are offenses enumerated in section 186.22, subdivision (e). Accordingly, we conclude on this record that there was sufficient evidence to support the jury's finding that one of the primary activities of defendants' respective gangs was the commission of statutorily enumerated offenses. (<u>Sengpadychith</u>, <u>supra</u>, 26 Cal.4th at ¶. 323-324.)

Cal. Ct. App. Opinion, pp. 22-24.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of the state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, <u>Jackson v. Virginia</u>, 443 U.S. 307, 321 (1979), which, if proven, entitles the petitioner to federal habeas relief, <u>id.</u> at 324. The federal court determines only whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Id.</u> at 319. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. <u>Id.</u> at 324. And after the AEDPA, a federal habeas court applies the standards of <u>Jackson</u> with an additional layer of deference, asking whether the state court's application of <u>Jackson</u> was objectively unreasonable. <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1275,

1   1278-79 (9th Cir. 2005).

2       It is decisive here that a federal "sufficiency of the evidence" inquiry is channeled by state

3   law -- although federal law requires sufficient evidence, it is state law that sets out the elements

4   as to which there must be sufficient evidence.  Sarausad v. Porter, 479 F.3d 671, 678 (9th Cir.

5   2007) (Jackson standard must be applied with explicit reference to the substantive elements of

6   the criminal offense as defined by state law), reversed on other grounds by Waddington v.

7   Sarausad, 555 U.S. 179 (2009).  As discussed above, the state court observed, "[t]he phrase

8   'primary activities,' as used in the [California] gang statute, implies that the commission of one

9   or more of the statutorily enumerated crimes is one of the groups's 'chief' or 'principal'

10  occupations."  People v. Sengpadychith, 26 Cal. 4th 316, 322 (2001).  Proof that a "group's

11  members consistently and repeatedly have committed criminal activity listed in the gang statute"

12  is sufficient to establish the gang's primary activity.  Id. at 324.  In order to determine whether

13  the primary activity element is satisfied, the trier of fact may consider past offenses and the

14  charged offenses.  Id. at 320, 323; People v. Duran, 97 Cal. App. 4th 1448, 1465 (2002).  Expert

15  testimony, such as the testimony at issue here, may be used to establish that one of the group's

16  primary activities is the commission of statutorily enumerated offenses.  Sengpadychith, 26 Cal.

17  4th at 324; People v. Gardeley, 14 Cal. 4th 605, 617-20 (1996).

18      In the present case, the California Court of Appeal's rejection of Salinas' claim was

19  reasonable.  The evidence at trial showed that on the evening of October 8, 2005, Andrew

20  Satterwhite and Robert Conrad were assaulted and robbed by Norteño gang members while they

21  walked through Boggini Park on their way home from a friend's house.  Detective Dominguez

22  was initially called as the prosecution's gang expert in "the operation, activities, and membership

23  in Hispanic street gang[s]" prior to his redirect.  RT 117.  He testified that both the El Hoyo

24  Palmas and East Side San Jose were Norteño gangs in San Jose.  RT 122.  He further testified

25  that Norteño gang members intimidate non-gang members by taking their property and

26  sometimes using force to do so.  RT 124.  He has spoken to victims of such robberies and

27  assaults at hospitals, who have been beaten badly by a Norteño gang member.  RT 127.  Both

28  robbery and assault are included in the enumerated offenses.  See Cal. Penal Code § 186.22(e).

1   The evidence that Detective Dominguez testified about on direct -- before he was recalled by the

2   prosecution -- included what offenses the El Hoyo Palmas consistently and repeatedly commit,

3   what information he was relying on, and where he got the information he used to establish the

4   primary activities element of the gang enhancement.  There thus was constitutionally sufficient

5   evidence to support the jury's findings as to the sentence enhancement.  Accordingly, Salinas is

6   not entitled to habeas relief based on this claim.

7

8                                      **CONCLUSION**

9           For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  A certificate

10  of appealability will not issue.  Reasonable jurists would not "find the district court's assessment

11  of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

12  Salinas may seek a certificate of appealability from the Ninth Circuit Court of Appeals.  The

13  clerk shall enter judgment in favor of respondent, and close the file.

14          IT IS SO ORDERED.

15  DATED: October 4, 2011                    _____

16                                            SUSAN ILLSTON
                                              United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California